## 10314

### STATE v. BURDETTE

#### (101 S. E. 664)

1. HOMICIDE—USE OF WORD "RUN" IN INSTRUCTION AS TO SELF-DEFENSE NOT EQUIVALENT TO RETREAT.—In a prosecution for homicide, the Court in charging on self-defense erred in stating that the law required defendant to take any reasonable way of safeguarding himself even if it was to "run," the word "run" not having the same meaning as the word "retreat," when applied to the conduct of one who claimed to have acted in self-defense.

2. HOMICIDE—BROTHER HAS RIGHT OF SELF-DEFENSE AGAINST SISTER'S PARAMOUR.—Where deceased and defendant's sister were in the woods on the lands of the deceased for the unlawful purpose of sexual intercourse, defendant not only had .the right, but it was his duty to resort to all reasonable means to prevent his sister and deceased from accomplishing their purpose, though the sister was of mature years, provided he did not commit a breach of the peace, and the mere fact that his protest or conduct was calculated to bring on a difficulty, and did so, did not deprive him of the right of self-defense if in apparent danger of losing his life or suffering serious bodily harm, nor was he bound to retreat.

3. HOMICIDE—BROTHER COULD NOT PREVENT INTERCOURSE BETWEEN SISTER AND DECEASED BY KILLING PARAMOUR.—Defendant, who had followed his sister and deceased upon the latter's lands, where the two had gone for the purpose of having sexual intercourse, had no right to use physical force to prevent the intercourse, unless in

<hr/>

NOTE.—This case seems to have been overlooked by a former Reporter.                              W. M. SHAND, *Reporter.*

his presence and after he had protested; but, even in that case, he could only use such force as was reasonably necessary to prevent the act, and could not resort to killing.

4.    HOMICIDE—HARMLESS INSTRUCTION ON SELF-DEFENSE.—In a prosecution for homicide, claimed to have been committed in self-defense during an altercation, when he attempted to prevent deceased from having sexual intercourse with his (defendant's) sister, error in instructing that, if defendant's conduct was such as was reasonably calculated to bring on a difficulty, he was not without fault *held* harmless to defendant; there being no testimony that the two were in the act of cohabitation, in defendant's presence, when the difficulty took place.

Before PRINCE, J., Laurens, March, 1919.    Reversed.

W. Robert Burdette indicted for the murder of D. D. Stoddard.    Upon conviction of manslaughter defendant appeals.

*Messrs. Cothran, Dean & Cothran,* for appellant, cite: *Defendant must have been free from fault in bringing on the difficulty to avail himself of plea of self-defense:* 141 Ala., 32; 24 S. C., 283; 43 S. C., 132.    *Legal duty of brother to protect sister:* 13 R. C. L., 836; 78 S. C., 253. *Deceased violating defendant's home could not have set up self-defense:*    78 S. C., 83.

*Mr. H. S. Blackwell, Solicitor,* and *Featherstone & Knight,* for respondent, cite: *Right of brother to use force to prevent voluntary sexual intercourse by sister with another as affecting his right to set up self-defense*s 54 Am. Rep., 558; 53 Am. Rep., 389; 67 L. R. A., 536; 136 A. L. R., 74; 92 A. S. R., 205; 54 L. R. A., 780; 2 L. R. A. (N. S.) 55-60.    *Duty to retreat:*    109 S. C., 410; 103 S. C., 321.

December 23, 1919.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The defendant was indicted for the murder of D. D. Stoddard, convicted of manslaughter, and sentenced to ———— years at hard labor in the State penitentiary, or upon the public works of Laurens County.

He appealed upon the following exceptions:

1. "His Honor, the presiding Judge, erred in charging the jury as follows: 'Now the fourth proposition that he must prove that at the time he fired the fatal shot there was open to him apparently no other reasonable way of saving himself. If there be, the law requires him to take it, even if that reasonably safe way is to run, however humiliating it may be to him personally. If there is a reasonably safe way of saving himself the law requires him to take that way, and save the shedding of human blood. Now, of course, in this day of firearms, that does not mean that a man must run, under circumstances or in circumstances, where, by running, he would increase his danger.'

Specifications of error:

(a) In using the words 'run' and 'running' instead of the words 'retreat' and 'retreating,' the former conveying a meaning different from the latter, which are recognized as the proper legal expression.

(b) By the use of the words 'run' and 'running'.instead of the words 'retreat' and 'retreating,' the jury was misled as to the defendant's rights, under the circumstances, and under his plea of self defense."

2. "His Honor, the presiding Judge, erred in charging the jury as follows, after they had returned for further instructions:

'A man should run if by running he could save his life or person from serious bodily harm.'

Specifications of error:

(a) In using the words 'run' and 'running' instead of the words 'retreat' and 'retreating,' the former conveying a meaning different from the latter, which are recognized as the proper legal expression.

(b) By the use of the words 'run' and 'running' instead of the words 'retreat' and 'retreating,' the jury was misled as to the defendant's rights under the circumstances and under his plea of self defense."

3. "His Honor, the presiding Judge, erred in charging the jury as follows:

'A woman who is 21 years of age has the right to yield her person to whom she will, and her brother cannot prevent it by actual physical force. It is different if a woman is immature; but where she is 21 years of age she has the right, if she elects to do so, to yield her person of her own free will to whom she will, and a brother would not have the right to use physical force to prevent it,' in connection with the following charge:

'If a man suspects that his sister is inviting another man in the woods for improper relations, he has the right to go into the woods to see whether or not it be true; and he has the right to protest against their conduct; and that would not be such fault in bringing on a difficulty as would deprive him of the law of self defense. * * * * Of course, if he was there merely for the purpose of protesting, and if his conduct was not such as is reasonably calculated to bring on a difficulty, he had the right to protest against the deceased debauching his sister; but if his conduct was such as is reasonably calculated to bring on a difficulty, and he persisted in it, he is not without fault in bringing on the difficulty.'

Specifications of error:

(a) The effect of this charge was to convey to the jury the instruction that a brother who attempts by physical force to prevent the debauching of his sister in his presence, whether in a combative spirit or not, has been so much at fault in bringing on a difficulty with the debaucher as to deprive him of the right of self defense; a proposition abhorent to civilized society and contrary to law."

The facts are thus stated in the testimony of W. Robert Burdette, the defendant: "Thirty years old; not married; brother of Mrs. Dee Bolt; been living with father and mother all my life; Mrs. Bolt has been married; she and her husband have not lived together for ten or eleven years;

since the separation she has been living with father and me;
she has two boys by the Bolt marriage.; no one else lives
with us; I have brothers; they are married and live away;
all these years I have been living with the old folks taking
care of them; Stoddard lived about a mile south of our
house; prior to that he had been living nearer our home,
about 150 yards; he moved in spring of 1917; after he
moved he visited at father's home; he has a son who mar-
ried my sister; she was younger than Mrs. Bolt; Mrs. Bolt
was about 30 when this happened; Stoddard's son and my
sister lived at his house, about a mile and a quarter from
us; Mr. Stoddard did his blacksmith shop work at our
house; was there frequently; visited socially often; Mrs.
Bolt would see him when he came; the first time I had
reason to suspect improper relations was a few days before
the homicide; I received the information from Mr. Stod-
dard's son, Dennis, who married my sister; he told me
things had been going wrong; that it had been going on
for some time; that he had seen his father going there with
a ladder at night; father and mother live in the first story
of the house; my sister and I stayed in the second story;
I had one room and she had another, with the hall between
us; I asked Dennis to talk to his father and get him to stop
it; he told me that he had talked to his father about it; he
told me that his father drew out his knife and cursed him
and told him he would cut his damn throat if he ever men-
tioned it again; he said he had started toward him and he
picked up a rock and said you are my father, but you must
not go on me with that knife; on the morning of the homi-
cide I was around home; I decided to go up to the store to
get some smoking tobacco and I thought I would go through
the pasture; Mr. Thompson, who runs a store, and I were
on a gun trade and I carried my gun with me; after I got
into the pasture I thought what my sister said that morning
that she was going to Mr. Weeks,' and Mr. Stoddard was
there the afternoon before at our house; I saw them there

talking together and her saying that she was going to Mr. Weeks'; I decided that I would go down there and see for myself if things were going wrong; I found Mr. Stoddard down there and my sister came up and they were talking; I saw him a minute or two before she came, standing in the bushes; he walked out to the road and then walked back into the bushes, and then walked out to the road again and turned and came back and did that the third time and she came up then and they spoke; he asked my sister if she had seen Dennis that morning and she answered no; there was something said about me, I did not understand what it was, but my sister said that he had gone to the store; he asked her then to stop aside with him; she told him no; she said she didn't have time; they started in the opposite direction from me out through the woods; I walked up and spoke to Mr. Stoddard; I said, 'What are you all doing here?' he replied, 'God damn you, I will give you to understand how to watch me,' and he turned and stooped as if he was reaching for a gun or something; I could not see what for the thickness of the bushes, and I shot and he walked on down the hill and said, 'Don't shoot any more'; I thought he was getting a gun; I thought I was in danger when he cursed and made an attempt to get something; I thought he was reaching for his gun and I felt that my life was in danger; I shot him because I thought my life was in danger; he was attempting to get something; I was going to talk to him and ask him kindly to stop treating the family as he was and remain friendly with him, but he would not allow me; he stooped to get his gun or something, I could not see what; I told his son, Dennis, that I had shot him; he didn't ask me any questions; I did not want to shoot Stoddard; after I fired he said, 'Don't shoot any more, you have shot me,' and went on down the hill; I told him to sit down and we would carry him home."

The following statement appears in the record: "After the jury retired and had been out for some time, it returned

and asked the presiding Judge for further instructions and charge on the law of retreat, in connection with that of self-defense. Whereupon the presiding Judge charged them: That the jury was not to seek an excuse to acquit the defendant, neither was it to seek an excuse to convict him. He repeated the instructions given in the charge submitting the cause to the jury, that a man should run, if by running he could save his life, or his person from serious bodily harm. That if a man were on his own premises it was not incumbent on him to run, if he be without fault in bringing on the difficulty."

The case of *State v. Jordan,* 109 S. C., 409, is conclusive of the question presented by the first and second exceptions. In that case this Court used the following language: "There can be no doubt that the word 'run' is accepted as being entirely different in meaning from the word 'retreat,' when applied to the required conduct of one claiming to act in self defense."

We proceed to the consideration of the third exception. There was testimony to the effect that D. D. Stoddard, the deceased, and Mrs. Lee Bolt, the sister of the defendant, were in the woods on the lands of Stoddard for an immoral and unlawful purpose at the time the defendant made his appearance; the defendant not only had the right, but it was his duty, under the circumstances, to resort to all reasonable means to prevent his sister and the deceased from accomplishing their purpose of sexual intercourse, provided he did not commit a breach of the peace in attempting to prevent them. He had the right to protest, to be present where they were, to follow them, and as we have said, to do whatever else was necessary to thwart their purpose of cohabitation, if he could do so without a breach of the peace. The mere fact that his protest or his conduct may have been calculated to bring on a difficulty, and actually did have that effect, would not deprive him of the right of self defense, in case he was in danger of losing

his life or suffering serious bodily harm.  Nor was he bound to retreat, although the difficulty took place on the lands of the deceased, for the reason that it was not only his right but his duty to use such means as we have mentioned to prevent the parties from accomplishing their immoral and unlawful purpose.

The defendant, however, did not have the right to use

3, 4 physical force to prevent their cohabitation, *unless in his presence, and after he had protested.* But even in that case he could only use such physical force as was reasonably necessary to prevent the act of sexual intercourse.  There was no testimony, however, tending to establish the fact that they were in the act of cohabitation, in the presence of the defendant when the difficulty took place.

Therefore, the error specified in the third exception was not prejudicial.

The judgment of the Circuit Court is reversed and the case remanded for a new trial.